EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* TRINIDAD ARROYO PÉREZ c/p TRINO PÉREZ, demandado y apelante.

*Número:* CR-66-262      *Resuelto:* 21 de septiembre de 1967

*Santos P. Amadeo,* abogado del apelante; *J. B. Fernández Badillo, Procurador General,* y *Peter Ortiz, Procurador General Auxiliar,* abogados de El Pueblo.

SENTENCIA

Se revoca la sentencia de 18 de junio de 1962 en la causa criminal Núm. M61-809 de la Sala de Bayamón del Tribunal Superior de Puerto Rico y se absuelve al acusado.

Así lo pronunció y manda el Tribunal y firma el Señor Juez Presidente, quien al igual que el Juez Asociado Señor Santana Becerra, no intervino. El Juez Asociado Señor Belaval emitió su opinión por separado, en la cual concurre el

Juez Asociado Señor Hernández Matos. El Juez Asociado Señor Ramírez Bages disintió.

(Fdo.) Luis Negrón Fernández
*Juez Presidente*

Certifico:

(Fdo.) Joaquín Berríos
*Secretario*

—O—

El Juez Asociado Sr. Belaval emitió opinión por separado en la cual concurre el Juez Asociado Señor Hernández Matos

San Juan, Puerto Rico, a 21 de septiembre de 1967

Todo lo que propone esta apelación, como único error, es lo siguiente: "De acuerdo con las disposiciones de la Sección 3 [entiéndase 4] de la Ley Núm. 220 antes mencionada se requiere que se arreste una persona que está violando la ley de bolita inmediatamente. Se le conduzca ante un fiscal, hoy sería ante un juez, para que se le radicara la acusación en vista de la prueba obtenida. Este mandato de la ley es inconsistente con el sistema de encubiertos que sin autorización de ley se ha establecido en Puerto Rico para investigar y hacer cumplir la ley de la bolita. Esta situación pone en desventaja al acusado porque el resultado del juicio depende de si el juez cree al acusado o cree al agente encubierto. Y además, como el arresto no se hizo inmediatamente sino que fue cerca de tres meses después de la supuesta comisión del delito, esto pone en desventaja al acusado, ya que evita que él pueda presentar una defensa de coartada, cosa que no puede hacer porque no puede recordar donde estaba el día en que el agente encubierto alega le hizo la venta de bolita. Aquí se plantea por lo tanto, no un problema de juicio rápido sino un pro-

blema de juicio imparcial protegido por el debido proceso de ley."

El primer fundamento no nos convence. El Estado se vale de tres sistemas de persecución de un delito: (1) el arresto inmediato cuando el hecho delictivo ocurre en presencia de un agente del orden público; (2) el allanamiento posterior cuando algún acto hace sospechar al agente que un delito se está cometiendo; (3) la redada, una persecución más extensa con el objeto de aprehender toda una organización de delincuentes. Es natural que la Sec. 4 de la Ley Núm. 220 del 1948 se refiera a la primera modalidad de persecución, o sea, al arresto inmediato cuando el hecho delictivo ocurra en presencia de un agente de orden público. Contrario a lo que se supone, la rapidez del procedimiento provisto por la Sec. 4 de la Ley Núm. 220 de 1948, según enmendada, no está inspirada en la mayor protección del acusado, lo cuál sería un contrasentido en un delito declarado estorbo público, sino en crear un "rigor" en la persecución del acusado dentro de la tensión característica del "escarmiento" público.

Cuando se necesita obtener evidencia objetiva que compruebe la ocupación delictiva de un sospechoso, la orden de allanamiento resulta siempre lo indicado. Resulta además un método eficaz cuando se necesita paralizar las operaciones de un grupo creado para delinquir, mediante la destrucción de los materiales del crimen. Además no conflige con el arresto individual inmediato.

El problema que crea la redada es que se trata de un método de persecución que, por no estar ideado para el arresto inmediato ni para el arresto posterior de sospechosos o la destrucción de los materiales del crimen, sino para la persecución de un tipo de crimen político, no funciona armónicamente cuando se aplica al enjuiciamiento ordinario. Como es sabido, la redada se usa para enfrentarse a los "Delitos contra la Patria"—traición, espionaje, sabotaje, venta

de documentos secretos—o a los delitos contra la seguridad del Estado, como son los contrabandos de armas o drogas. *Vide*: Juan B. Carballa, *Delitos contra la Patria*, edición de 1951 de la Biblioteca de Publicaciones Oficiales de la Facultad de Derecho y Ciencias Sociales de la Universidad de Montevideo. En la redada, las oportunidades de defensa del acusado, los actos de instigación del agente encubierto, lo imponderable del riesgo social, todo debe ser celosamente escrutinizado, mirado con ojos·tranquilos, hasta que se abra en nuestra conciencia la rosa cárdena de la justicia.

En lo que tiene razón el acusado apelante es que cuando el enjuiciamiento de un acusado se reduce a dos simples declaraciones, una, la del agente encubierto con una escueta anotación de los hechos suficientes para constituir un delito, pero sin ningún indicio que nos ayude a llegar hasta la verdad de la cual se nutre la justicia, otra, la del acusado, con el hecho delictivo un tanto desdibujado en su memoria por el transcurso del tiempo, que tiene que conformarse con una simple·negación de los hechos alegados por el agente encubierto, se produce el dilema de creer a un agente del orden público o de creer a un acusado puede darse la tendencia de creer más al agente encubierto que al perturbador de la paz pública, y de esta forma producirse la situación contraria a todo orden jurídico, de resolver en contra del acusado cualesquiera extremos dubitativos que contenga la prueba.

Felizmente en este caso no es tan cerrado el dilema. El único testigo de la prueba de inculpación es el agente encubierto Roberto Flecha Delgado, quien declara, que para el 16 de septiembre de 1961, trabajaba para la División del Control del Vicio de la Policía de Puerto Rico, asignado al pueblo de Dorado; que ese día al llegarse hasta la barriada San Antón de Dorado, se encontró al acusado en un kiosko pequeño que había al lado de la casa de él; que el testigo se arrimó a tomar una cerveza y entonces pudo notar que el

señor le apuntaba números de bolita a la señora que estaba allí, "números de tres cifras, seguidos de guión, de otras sumas a la derecha, en una lista de papel blanco, papel de libretas escolares, entonces yo le ofrecí mi deseo de apuntar números. Le dije que me apuntara el 650 con 80 centavos, el cual él anotó debajo de los demás números que tenía apuntados y apuntó el 650, guión y 80 centavos a la derecha y entonces hablamos un rato y me dijo que me iba a conseguir libretas de boli-pool para vender, para yo ponerme como bolitero de él también y quedamos en eso y como a los tres o cuatro días siguientes volví a su casa a ver si me había conseguido las libretas y me dijo que él había dejado eso ya"; no le entregó copia de los números; "no lo arresté porque yo estaba haciendo una investigación confidencial y si yo lo arrestaba se revelaba mi identidad de agente encubierto"; que el kiosko "es un negocio pequeño que tenía una vecina de él allí, entonces es un negocito pequeño que vendían cervezas y diferentes golosinas y refrescos", que "la persona que estaba allí atendiendo el negocio" era "una señora ella de bastante edad, que es vecina de él"; que cuando se hizo la transacción, "ella estaba a la parte de adentro y nosotros a la parte de afuera mientras comprábamos"; sabe que el señor (el acusado apelante) vive por allí, más adelante, en una casa de cemento de balconcito pequeño; que el vio al acusado "por espacio de tres veces, el día antes de la transacción, el día de la transacción y tres o cuatro días más tarde que volví a su casa".

Contrainterrogado por el abogado del acusado, a la pregunta: ¿quién es la señora esa que usted (el agente) dice que le compraba números? Contesta: La señora, no recuerdo el nombre; a la pregunta: ¿Cómo es esa señora? contesta: media trigueña como de algunos 50 años; a la pregunta: ¿Esa señora estaba trabajando en el kiosko? Contesta: Sí, señor; era propiedad de ella. Repreguntado sobre cuál era su misión, contestó: "era ir por ese sector del pueblo de

Dorado, trabajar como agente encubierto, colectar evidencia en cuanto a violaciones de la ley que yo viera para luego proceder a hacer su denuncia''; que él vio al acusado tres veces, pero sólo una vez lo vio bregar con material de bolita. Ésta es toda la prueba de inculpación.

El acusado declaró tener 62 años, dedicado a trabajar en construcciones, "estoy trabajando allá en Garden Hills hace como siete años . . . primero trabajaba en el Hotel Dorado", trabaja en construcciones desde hace más de veinte años; "bueno, yo nunca he visto a ese elemento" (se refiere al agente encubierto que declaró.) "yo lo ví ese día que yo estaba durmiendo en casa, al mediodía y entonces la señora que estaba en el negocio, ve, pues me mandó a buscar a mí . . . una señora que él acusó de un delito que había cometido de eso de ley de bolita, entonces yo iba cuando ví a ese señor, lo ví allí, al verlo entonces pues me dice: 'Ola Trinidad, como tú estás, ya tú no me conoces'; no, señor, yo no lo conozco, yo no sé quien es usted; 'que no me conoces, tú no te recuerdas cuando estaba trabajando en el hotel', yo le dije: 'Yo no lo conozco,' entonces pues dice: 'Mira lo mío es . . . yo estaba en Estados Unidos, yo estaba en Estados Unidos y me dedicaba a la ley de bolita, me dedicaba a eso y eso lo deja todo, esa es una cosa que vale la pena' entonces pues dice: 'Yo quiero que tú me juegues un número' yo le dije: 'que yo le juegue un número, ni sé lo que es bolita, no quiero saber de bolita'; 'Sí hombre sí, ¿y tú no me puedes conseguir 25 ó 30 libretas que yo te las vendo', que yo le consiga libretas, 'usted se cree que yo soy un banquero', no, me dijo 'mira lo que pasa es que yo soy un hombre que me dedico a eso . . . . Se fue y no pasó nada. Al otro día vuelve que si ya yo le conseguí aquello, que si le conseguí las libretas o que le recibiera de un apuntado que él me traía, que el me traía una colecta de apuntado. Eso fue todo' ''; que él no le vendió ningún número 650 con 80 centavos, ni nunca ha sido bolitero.

Contrainterrogado por el fiscal de la Sala de Bayamón, Sr. Grajales, contestó que no conocía al agente encubierto, y a pesar de eso, es dicho agente quien inicia la gestión "para que yo le vendiera o le buscara libros o que le recibiera colectas, para él traerme a mí"; que fue él, quien "me salió a mí" no el testigo al agente instigador y él contestó que "yo no vendía eso ni jugaba eso"; que el testigo no sabía que el que le salió a comprarle o a venderle bolita era un policía; a la pregunta: "¿por qué fue que él lo visitó al día siguiente buscando unas libretas de bolita?" contesta: "porque él me dijo que si yo le podía conseguir 25 ó 30 libretas que él era un bolitero"; que eso se lo dijo el día que lo vio por primera vez, y que en ese momento no estaba nadie con él y el acusado no le contestó nada; que el agente encubierto le pidió al acusado "que le consiguiera 25 ó 30 libretas y el acusado le contestó: 'usted cree que yo soy algún bolitero o algún banquero . . . eso fue todo' " y a pesar de eso, al otro día vino a casa del acusado a buscar las libretas, a pesar de que el acusado le dijo que no era banquero o bolitero.

Como se recordará, el agente encubierto aclarando las veces que había visto al acusado, declaró: "por espacio de tres veces, el día antes de la transacción, el día de la transacción y tres o cuatro días más tarde que volví a su casa"; que el día de la transacción había visto al acusado "por los alrededores"; un momento antes había declarado que "como a los tres o cuatro días siguientes volví a su casa a ver si me había conseguido las libretas y me dijo que él había dejado eso ya, parece que él tuvo sospecha o algo de mí." El acusado, ahora sometido a interrogatorio, declara que al otro día volvió el agente a pedirle que le consiguiera las libretas, que le contestó lo mismo que no era banquero ni bolitero; que el agente "se fue en ese mismo momento y entonces volvió por la tarde a que si no le conseguía las libretas que le recibiera una lista de apuntado que él me traía una colecta de $40.00 a $50.00 pesos que se la reci-

biera"; que el acusado le contestó: "Mire señor usted ya me tiene cansado, que usted se cree que yo soy, yo soy un hombre que me dedico a trabajar, tengo una familia grande, si yo tengo que asar un puerco lo aso, si tengo que hacer una corrección de una planta yo voy y la hago. Eso fue todo lo que pasó."; que él tiene diez y seis hijos y que puede decir "bajo juramento y ante Dios" que nunca le vendió al agente encubierto un número de bolita y que nunca se ha dedicado al juego de la bolita.

El segundo testigo de la defensa es el señor Ramón Ruiz Sánchez, que conoce al acusado alrededor de siete a ocho años dedicado al negocio de construcciones, "un hombre muy serio, muy dedicado a su familia. Tiene 16 hijos y además de eso ha recogido dos o tres niños de vecinos que las madres han muerto, de los niños y él se ha dedicado a criarlos y trabaja arduamente en construcciones de casas para mantener a esa familia"; que hasta donde él sabe el acusado no tiene reputación de bolitero.

En un orden estricto de prueba, lo que presenta este caso es la simple declaración de un agente que dice que el acusado le apuntó un número, sin que conste de la prueba que pagara por dicho número y enseguida un claro intento de instigación para conseguir que el acusado le preparara 25 ó 30 libretas escolares de las que se usan para vender la bolita y viendo que no conseguía del acusado las libretas le instiga a recibir una lista de apuntados, en la cual había una colecta de $40.00 a $50.00 ya jugados. A todo esto se niega el acusado, según se desprende de la propia prueba de la acusación. La explicación que da el agente para esta negativa es que tal vez el acusado llegara a sospechar que él era un agente encubierto; la explicación que da el acusado es que se negó a hacerlo porque él no era banquero ni bolitero. Ante esta serie de circunstancias es natural que nuestro ánimo se mantenga indeciso. Y en caso de duda:

*Debe revocarse la sentencia dictada por la Sala de Bayamón del Tribunal Superior de Puerto Rico de fecha 18 de junio de 1962 en la causa criminal M61-809 de dicha Sala.*